CLIFFS NOTES, INC.,
Plaintiff–Appellee,

v.

BANTAM DOUBLEDAY DELL
PUBLISHING GROUP, INC.,
Defendant–Appellant.

No. 389, Docket 89–7774.

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1989.

Decided Sept. 5, 1989.

Opinion Filed Sept. 22, 1989.

Gregory L. Diskant, New York City (Patterson, Belknap, Webb & Tyler, Barbara A. McCormick, Harriette K. Dorsen, Katherine Trager, Bantam Doubleday Dell Pub. Group, Inc., of counsel), for defendant-appellant.

William M. Hart, New York City (Milgrim Thomajan & Lee P.C., Alfred T. Lee, of counsel), for plaintiff-appellee.

Weil, Gotshal & Manges, New York City (R. Bruce Rich, Linda Steinman, of counsel), for The Ass'n of American Publishers, Inc., amicus curiae.

Before FEINBERG and NEWMAN, Circuit Judges, MISHLER, District Judge.[*]

FEINBERG, Circuit Judge:

Defendant Bantam Doubleday Dell Publishing Group, Inc. appeals from an order, dated August 2, 1989, of the United States District Court for the Southern District of New York, Shirley Wohl Kram, J., enjoining defendant-appellant from distributing Spy Notes, a parody of the Cliffs Notes series of paperback books published by plaintiff-appellee Cliffs Notes, Inc.[1] This appeal raises basic questions over application of trademark law to an allegedly infringing literary parody. For reasons given below, we vacate the injunction.

### Background

The appeal involves three principals, although only two of them are parties. The first is plaintiff-appellee, which publishes a series of study guides, known as Cliffs Notes. As many college students are aware, Cliffs Notes are condensed versions, with brief analyses, of various short stories, plays and books. The cover of a typical Cliffs Notes book lists the name of the work that is to be condensed and discussed in the pages that follow. Although appellee asserts that a variety of readers, and not just students, purchase Cliffs Notes, students apparently form the primary audience for the books. This is reflected in the roster of available Cliffs Notes, which contains most of the titles that one would expect to encounter in college literature and English classes.

The second principal is defendant-appellant, a well-known publishing company, which publishes Spy Notes. The third principal is Spy magazine, which appellant does not publish. Spy magazine contains a mixture of journalism, humor and satire. Its purpose is to provide political and social commentary in an entertaining manner, and its style of humor is quite sharp. Even

---

[*] Honorable Jacob Mishler, Senior United States District Judge for the Eastern District of New York, sitting by designation.

[1] There is some confusion over the proper form of "Cliffs" and "Cliffs Notes." The parties use the possessive form of Cliff by referring to Cliff's and Cliff's Notes. The titles on the books themselves, however, omit the apostrophe. We use the latter form.

though the magazine was founded only three years ago, it has a substantial circulation and has received considerable acclaim. Spy editors have been featured or interviewed in the press and on television. Recently, Spy magazine received the accolade of being itself the subject of a full-blown parody called "Sty," published by Random House.

Although Spy magazine is not a party to this lawsuit, it played a key role as one of the two creators, along with defendant-appellant, of Spy Notes. The idea behind Spy Notes was to create a double parody. First, Spy Notes would poke fun at certain novels—Tama Janowitz's *Slaves of New York*, Brett Ellis's *Less Than Zero* and Jay McInerney's *Bright Lights, Big City*—which a Spy editor described in the district court as defining "a genre of savvy, urban novels depicting the drug abuse, promiscuity and post-adolescent angst of the 1980s." The editor further noted that "[b]ecause of their literary shortcomings and their familiarity to Spy readers, these novels were a natural target for Spy's satirical commentary." In addition, Spy Notes would satirize Cliffs Notes. Spy magazine editors thought that a study guide would provide an ideal vehicle for a parody of these works, because "[t]he flat, straightforward, academic style" of Cliffs Notes "would appear incongruous with the cool, ironic, sophisticated, urbane novels and thus greatly enhance the humor of the satire." Furthermore, "because most college graduates and students have seen or heard of" Cliffs Notes, the readers of Spy and the audience targeted for Spy Notes would be "familiar with the format and style" of Cliffs Notes.

Appellant and the Spy editors produced Spy Notes, a one-time parody of Cliffs Notes. Appellant readily admitted that it copied the prominent features of Cliffs Notes in order to make Spy Notes an effective parody. Thus, just as a Cliffs Notes book does, Spy Notes lists on the cover the works it condenses, i.e., the three novels referred to above. In addition, the cover of Spy Notes replicates the distinctive yellow color, black diagonal stripes and black lettering of Cliffs Notes, a design that is the subject of appellee's registered trademark.

At the same time, there are some important differences between the two books. (We will focus on the covers, as the district court did, because appellee's trademark protects the cover of Cliffs Notes; however, the humorous content of Spy Notes is also quite different from the serious condensation and analysis of Cliffs Notes). For example, the cover of Spy Notes, unlike that of Cliffs Notes, prominently states "A Satire" five times in bright red lettering (and the back similarly states it four times), bears the notation "A Spy Book" with the logo of Spy magazine against a bright red background, uses the word "Spy" four times, and shows a clay sculpture of New York City rather than the clay sculpture of a mountain that typically appears on Cliffs Notes. Also, the cover of Spy Notes contains red, blue and white—colors that are not used on the cover of Cliffs Notes—and bears wry notations not found on a Cliffs Notes cover, such as "All Those Other Hip Urban Novels Of The 1980s," and "Even Funnier Than The Originals." In addition, the Spy Notes cover price ($7.95) is substantially higher than that of Cliffs Notes ($3.50). Further, the cover of Spy Notes states prominently in red that it "Includes The Spy Novel-O-Matic Fiction-Writing Device!" This tool, which a prospective purchaser can inspect simply by opening Spy Notes, allows the "young, world-weary urban author" to create "16,765,056 different plot possibilities" by manipulating a card. A Cliffs Notes book contains no such obviously absurd shortcut to success. Finally, appellant plans to market Spy Notes in distinctive prepacks of 10 copies in a manner that prominently features the Spy name.

Early in July 1989, after the Spy Notes books had been bound but before the copies had been shipped to bookstores, appellee sued appellant. Appellee alleged that the cover of Spy Notes violated the Lanham Trade-Mark Act, because it would give consumers the false impression that Spy Notes was actually appellee's product. Appellee also asserted that the cover violated the New York common law of unfair com-

petition, as well as section 368–d of the New York General Business Law. Appellee sought preliminary and final injunctions against the distribution of Spy Notes, and other relief.

On August 2, 1989, the district court granted a preliminary injunction, reaching only appellee's claims under section 43(a) of the Lanham Act.[2] The court rejected what it characterized as appellant's "general theory that the First Amendment gives the parodist unbridled freedom to use a registered trademark as part of a parody or satire," and went on to analyze appellee's trademark claims under the eight-factor balancing test of *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Finding "a profound likelihood of confusion" between the cover of Spy Notes and that of Cliffs Notes, the district court held that appellee had demonstrated irreparable injury and a likelihood of success on the merits. The judge therefore preliminarily enjoined appellant from distributing the parody with its current cover design and ordered appellant to so advise the retail trade.

Since appellant had some 150,000 bound copies of Spy Notes ready to be distributed to the back-to-school market, and the school year was about to commence, appellant obtained an expedited appeal. We heard argument on September 1, and unanimously concluded that the preliminary injunction should not have been granted. Because of the urgency of the situation, on September 5 we vacated the injunction by order and issued the mandate forthwith, stating that an opinion would follow.

## Discussion

We review the district court's grant of a preliminary injunction under an abuse of discretion standard. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). "An abuse of discretion may be found when the dis-

trict court relies on clearly erroneous findings of fact or on an error of law in issuing the injunction." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 54 (2d Cir.1985).

■ We start with the proposition that parody is a form of artistic expression, protected by the First Amendment. For example, the Supreme Court has held that the First Amendment bars recovery "for the tort of intentional infliction of emotional distress by reason of" publication of satire "without showing in addition that the publication contains a false statement of fact which was made with 'actual malice.' " *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988). Similarly, our decisions have recognized "the broad scope permitted parody in First Amendment law." *Groucho Marx Prod., Inc. v. Day and Night Co.*, 689 F.2d 317, 319 n. 2 (2d Cir.1982); see *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252, 253 (2d Cir.1980) (per curiam) ("in today's world of often unrelieved solemnity, copyright law should be hospitable to the humor of parody ..."). We have stated the "general proposition" that "parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism." *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541, 545 (2d Cir.) (emphasis in original), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). See generally Note, Trademark Parody: A Fair Use and First Amendment Analysis, 72 Va.L.Rev. 1079 (1986).

At the same time, "[t]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir.), cert. denied, — U.S. ——, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). Books are "sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." *Rog-*

---

**2.** That section creates civil liability for:

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce....

15 U.S.C. § 1125(a).

*ers v. Grimaldi,* 875 F.2d 994, 997 (2d Cir.1989).

Conflict between these two policies is inevitable in the context of parody, because the keystone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border. A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

Thus, the principal issue before the district court was how to strike the balance between the two competing considerations of allowing artistic expression and preventing consumer confusion. We believe that the correct approach in this case was foreshadowed by our decision in *Rogers v. Grimaldi,* upon which appellant relies heavily. In that case, we considered a Lanham Act challenge by the actress Ginger Rogers against the producers and distributors of the film "Ginger and Fred." The movie was not about Ginger Rogers but rather about two Italian cabaret performers who imitated Ginger Rogers and Fred Astaire in their performances. Ginger Rogers contended that the title of the film created the false impression that she was the subject of the film or had endorsed it. See *Rogers,* 875 F.2d at 997. The district court held that the title was absolutely protected against Lanham Act claims by the First Amendment. Although this court's analysis in *Rogers* differed in major respects from that of the district court, we affirmed. We noted that "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict," *id.* at 998, and went on to hold that "the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." Id. at 999.

It is true that *Rogers,* though a Lanham Act case, was concerned with a very different problem from the one we have here. As indicated, the claim there was that a title was false or at least misleading because it could be (mis)understood to mean that Ginger Rogers was the subject of the work or that she had endorsed it. This case is not about whether a title is false advertising but whether the appearance of a work's cover is confusingly similar to the trademark elements of an earlier cover. Furthermore, the present case contains the added element of parody.

Appellee argues that the *Rogers* approach is not relevant to this case and that we should simply apply the *Polaroid* factors, as the district judge did. Appellee points out that the *Rogers* rule—that the Lanham Act's false advertising prohibition does not apply to titles with some artistic relevance to the underlying work unless they are explicitly misleading, id. at 999—does not protect "misleading titles that are confusingly similar to other titles." Id. at 999 n. 5. Since appellee claims that the cover of Spy Notes is highly misleading, and points out that the judge so found, appellee seizes upon the quoted language in *Rogers* as support for its position that the case has no application here. However, that language says only that where a title is complained about because it is confusingly similar to another title, the *Rogers* rule that titles are subject to the Lanham Act's false advertising prohibition only if explicitly misleading is inapplicable. But that does not mean, as appellee appears to claim, that nothing in the *Rogers* opinion is relevant to this case.

We believe that the overall balancing approach of *Rogers* and its emphasis on construing the Lanham Act "narrowly" when First Amendment values are involved are both relevant in this case. That is to say, in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion. *Id.* at 998–99. See also *Silverman,* 870

F.2d at 48 ("In the area of artistic speech ... enforcement of trademark rights carries a risk of inhibiting free expression ...."). And just as in *Rogers*, where we said that the expressive element of titles requires more protection than the labeling of ordinary commercial products, *Rogers*, 875 F.2d at 998, so here the expressive element of parodies requires more protection than the labeling of ordinary commercial products. Indeed, we have said, in the context of alleged copyright infringement, that a parody is entitled "at least" to conjure up the original and can do more. *Elsmere Music, Inc.*, 623 F.2d at 253 n. 1.

Thus, we hold that the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression, a category that includes parody. This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion " 'as to the source of the goods in question.' " *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 115 (2d Cir.1984) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam) (citation omitted), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). At the same time, a balancing approach allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work being parodied. Cf. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir.1979) (upholding an injunction, despite First Amendment claims, in a case concerning a pornographic movie with blatantly false and explicitly misleading advertisements).

To apply the *Rogers* approach in this case, we begin by noting the strong public interest in avoiding consumer confusion over Spy Notes. As we put it in *Rogers*, the purchaser of a book, "like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers*, 875 F.2d at 997–98. But, taking into account that somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression such as a parody, the degree of risk of confusion between Spy Notes and Cliffs Notes does not outweigh the well-established public interest in parody. In other words, we do not believe that there is a likelihood that an ordinarily prudent purchaser would think that Spy Notes is actually a study guide produced by appellee, as opposed to a parody of Cliffs Notes. And although the district court found a strong likelihood of confusion between the cover of Spy Notes and that of Cliffs Notes, based on its review of the eight *Polaroid* factors,[3] that determination is a legal conclusion which is reviewable by this court as a matter of law. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir.1987); *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004–05 (2d Cir.1983).

As indicated, we believe that the district court erred. This conclusion is based upon a number of factors. First, the district court apparently thought that the parody here had to make an obvious joke out of the cover of the original in order to be regarded as a parody. We do not see why this is so. It is true that some of the covers of the parodies brought to our attention, unlike that of Spy Notes, contain obvious visual gags.[4] But parody may be sophisticated as well as slapstick; a literary

**3.** As indicated, appellee argues that the *Polaroid* factors supply the relevant standard and that the district court correctly applied them. The *Polaroid* test has its origin in cases of purely commercial exploitation, which do not raise First Amendment concerns. Thus, the *Polaroid* test is at best awkward in the context of parody, which must evoke the original and constitutes artistic expression. In such a situation, the *Polaroid* factors should be applied with proper weight given to First Amendment considera-

tions, something the district court did not do here.

**4.** E.g., Sports Hallucinated for Sports Illustrated, with a floating basketball player on the cover. Cf. the National Lampoon parody of Cliffs Notes in the record, entitled Kondensed Kliffs Notes. The Kondensed Kliffs Notes version of Moby–Dick reads, in its entirety, "A whale bites off a man's leg and the man can't forget about it."

work is a parody if, taken as a whole, it pokes fun at its subject. Spy Notes surely does that, and there are sufficient reasons to conclude that most consumers will realize it is a parody. For example, a substantial portion of the potential audience for Spy Notes—i.e., college students or college-educated adults—overlaps with that for Cliffs Notes. Spy magazine, like Cliffs Notes, is widely read on some college campuses, although presumably for different reasons. As a result, the name "Spy" in the title, the notation "A Spy Book" emblazoned on the cover of Spy Notes and the use of a prepack marketing device prominently displaying the "Spy" name should alert the buyer that Spy Notes is a parody of some sort, or, at least, that it is not the same product as Cliffs Notes.

Furthermore, while the cover of Spy Notes certainly conjures up the cover of Cliffs Notes, the two differ in many respects. In addition to the differences listed in the following paragraphs, which indicate that Spy Notes is a parody of Cliffs Notes, the cover of Spy Notes contains red, blue and white, colors that do not appear on the cover of Cliffs Notes. Also, the Spy Notes cover shows a clay sculpture of New York City rather than a clay sculpture of a bare cliff. In addition, the price quoted on the cover of Spy Notes is about twice the price at which Cliffs Notes is sold, and appellant plans to market Spy Notes in large part through prepacks of 10 copies, which prominently present the Spy name.

■ In addition, a Cliffs Notes book is not likely to be bought as an impulse purchase. A prospective reader of Cliffs Notes probably has a specific book in mind when going to the bookstore for a study guide. And, even if a consumer did go to a store looking for a Cliffs Notes summary of any of the three books condensed in Spy Notes, that purchaser would not find one. Appellee does not produce Cliffs Notes for these novels, and has no plans to do so. There may be a few purchasers who have been assigned to read the novels who would buy the parody thinking it is a serious work and is produced by Cliffs Notes. In view of the public interest in free expression, that slight risk should be taken in order to allow the parody to be sold. Similarly, it is conceivable, though hardly likely, that some purchaser may mistakenly think that Cliffs Notes itself produced the parody, but that small chance does not justify the injunction here. There is no requirement that the cover of a parody carry a disclaimer that it is not produced by the subject of the parody, and we ought not to find such a requirement in the Lanham Act.

The label "A Satire" is also prominently used five times on the cover (and four on the back) of Spy Notes. Appellee conceded at oral argument that "satire," for this purpose, is the same as "parody." In addition, the prepack, a major promotional tool in which the books will appear in most, although not all, bookstores, bears the legend "The Outrageous Parody from the Creators of Separated at Birth" (the latter was a very popular book authored by Spy magazine editors). These measures should alert most consumers that Spy Notes is, in fact, a parody. Moreover, even for those few readers who might be slightly confused by the cover, the most likely reaction would be to open the book. Both the title page and the copyright notice page indicate that the book is written by the editors of Spy magazine and published by appellant. The copyright notice page states, "Spy Notes is a parody of Cliffs Notes." Furthermore, the reader would encounter the Spy Novel–O–Matic Fiction–Writing Device, which is an immediate tip-off that something non-serious is afoot.[5]

Finally, with few exceptions, most Cliffs Notes are summaries of the traditional "great books," rather than contemporary works or those somewhat outside the mainstream. As indicated above, the Spy editors certainly thought that the three novels were obviously not in the former category and that the purchaser would be aware of

---

5. By mentioning the items inside the book that would contribute to dispelling whatever risk of confusion might arise, we do not mean to suggest that a parody could copy the trademark aspects of the cover of a book without adequate indication on its own cover that it was a parody.

the humor of having Cliffs Notes summarize them. Moreover, the books that Spy Notes summarizes are characterized by their spare, stripped-down prose, and uncomplicated plots. The idea of condensing them at all is something of a parody. Thus, the consumer would likely be put on notice from the first that Spy Notes was not Cliffs Notes.

In short, we believe that the district court erred as a matter of law in concluding on the record before it that there was a strong likelihood of confusion.[6] Accordingly, it was error for the district court to enter a preliminary injunction, since there was not a likelihood of success on the merits on this Lanham Act claim. See *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). We are aware that this court recognizes an alternative test for a preliminary injunction —i.e., "sufficiently serious questions going to the merits ... and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Id. But we have no doubt that appellee's case also does not succeed under this standard, because the balance of hardships does not tip "decidedly toward" appellee.

### Conclusion

We conclude that the parody cover of Spy Notes, although it surely conjures up the original and goes to great lengths to use some of the identical colors and aspects of the cover design of Cliffs Notes, raises only a slight risk of consumer confusion that is outweighed by the public interest in free expression, especially in a form of expression that must to some extent resemble the original. The district court's ruling unjustifiably imposes the drastic remedy of a pre-publication injunction upon the cover of a literary parody. Accordingly, for the reasons set forth above, we vacate the injunction against appellant.

---

6. As is clear from the above discussion, we also believe that the district court's finding that the cover of Spy Notes is explicitly misleading is clearly erroneous.