**CHARLES ATLAS, LTD., Plaintiff,**

v.

**DC COMICS, INC., Defendant.**

**No. 99 CIV. 4389(NRB).**

United States District Court,
S.D. New York.

Aug. 29, 2000.

concerning the exercise of supplemental jurisdiction is inapplicable.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff Charles Atlas, Ltd. ("plaintiff" or "Atlas") brings this trademark infringement action against defendant DC Comics, Inc. ("defendant" or "DC"). Specifically, Atlas alleges that DC violated the unfair competition and trademark dilution provisions of the federal Lanham Act,[1] New York's anti-dilution statute,[2] New York's deceptive trade practices statute,[3] and state unfair competition common law, by using portions of a well known advertisement for Atlas's bodybuilding courses in several of DC's comic books. Now pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Oral argument was held on June 6, 2000. For the reasons set forth below, defendant's motion for summary judgment is granted.

## BACKGROUND

Plaintiff has been in the business of selling bodybuilding courses for over 70 years. Amended Complaint ("Comp.") ¶ 10. Over the years, advertisements for Atlas's bodybuilding courses have included a one-page comic strip story titled "The Insult that Made a Man out of Mac" ("plaintiff's comic ad"). In the storyline: (1) a bully kicks sand in Mac's face at the beach; (2) after taking the Atlas course, the skinny Mac develops a muscular physique; (3) Mac finds the bully, again on the beach, and punches him, for which he receives newfound respect, particularly from his female companion; (4) in the final panel, the phrase "HERO OF THE BEACH" appears as a halo-like formation hovering over Mac's head. Affidavit of Jeffrey C. Hogue, dated Mar. 22, 2000 ("Hogue Aff.") Ex. A.[4] Plaintiff owns no copyright in

Segal N. Magori, Akabas & Cohen, New York City, for Plaintiff.

Glenn Mitchell, Fross Zelnick Lehrman & Zissu, P.C., New York City, for Defendant.

1. 15 U.S.C. § 1125(a)(1) and § 1125(c)(1), respectively.

2. N.Y. Gen. Bus. Law §§ 368–d/370–i/360–1.

3. N.Y. Gen. Bus. Law § 349.

4. The most common variant of plaintiff's comic ad also includes a photograph of Charles Atlas himself, standing in a bodybuilder's pose and adorned in leopard-skin trunks. *Id.* However, the version of the ad

plaintiff's comic ad. Plaintiff's comic ad is well known and has repeatedly appeared in DC comic books. Comp. ¶ 13.

Defendant is a creator and publisher of numerous comic books and magazines. Among DC's best-known characters are Superman and Batman. Declaration of William Godfrey, dated February 24, 2000 ("Godfrey Decl.") ¶ 3. In February 1991, DC published and distributed a comic magazine entitled *Doom Patrol* No. 42, subtitled "The Sensational Character Find of 1991 ... FLEX MENTALLO." Godfrey Decl. ¶ 7, Ex. 1. A story within *Doom Patrol* No. 42, entitled "Musclebound— The Secret Origin of Flex Mentallo," explains how the character Flex Mentallo came to be imbued with superior strength. Like Mac in plaintiff's comic ad, Flex Mentallo was a scrawny weakling who had sand kicked in his face by a bully. After meeting a stranger who encourages him to obtain the booklet "Muscle Mystery for You," Flex Mentallo returns to the beach with his newly acquired muscular physique, and like Mac in the Atlas comic ad, he beats up the bully and becomes "the Hero of the beach."

The storyline of "Musclebound—The Secret Origin of Flex Mentallo" until this point explicitly mirrors the storyline of plaintiff's comic ad. The obvious visual resemblance between plaintiff's comic ad and "Musclebound—The Secret Origin of Flex Mentallo" is indisputable. The artwork and dialogue in *Doom Patrol* No. 42 replicate key elements of the artwork and dialogue from plaintiff's comic ad, including, *inter alia*, the look and placement of Mac, of the bully, of the women on the beach, and of various objects such as the beach ball and umbrella. Flex Mentallo also wears leopard skin trunks like the photograph of Charles Atlas that often appears along with plaintiff's comic ad, and is often depicted with the "Hero of the

beach" halo around his head. The words spoken by the characters are precisely those used in plaintiff's comic ad. Godfrey Decl. Ex. 1; Hogue Aff. Ex. A. Plaintiff alleges that defendant's blatant imitation of the well-known Atlas comic ad infringes on its trademark.

However, unlike Mac in plaintiff's comic ad, after Flex Mentallo acquires his powers, he beats up the woman he had been with by smashing her in the face and proclaims "I don't need a tramp like you anymore!" Godfrey Decl. Ex. 1. Plaintiff contends that this sexist and vulgar portrayal of the character tarnishes the trademark Atlas developed and imbued with goodwill over nearly 70 years. Hogue Aff. ¶ 29. *Doom Patrol* No. 42 has not been republished or redistributed since 1991. Godfrey Decl. ¶ 7.

The Flex Mentallo character subsequently appeared in the interior of issues 43 and 44 of *Doom Patrol* and was included in defendant's 1992 compendium of it comic book characters, *Who's Who In The DC Universe.* Godfrey Decl. Exs. 8,9; Hogue Aff. ¶ 37, Ex. I.

In 1996, DC published and distributed a four issue miniseries entitled *Flex Mentallo.* *Flex Mentallo* No. 1 contains, among twenty-four comic pages containing 130 panels, two individual panels using the phrase "Hero of the beach." Godfrey Decl. Ex. 2. (p. 5). *Flex Mentallo* No. 4 contains, among twenty-four comic pages containing 118 panels, one panel including the phrase "Hero of the beach" and one panel including the phrase "Gamble a stamp. I can show you how to be a real man." Godfrey Decl. Ex. 5 (pp. 17–18). The phrases "Hero of the beach" and "Gamble a stamp" appear in plaintiff's comic ad and are an integral part of its concept. Hogue Aff. Ex. A. Although no artwork from plaintiff's comic ad appears in any of the issues of the *Flex Mentallo*

submitted to the United States Patent and Trademark Office as the "Trademark Principal Register," *id.,* Ex. C, does not include the photograph of Atlas himself, or any leopard-

skin trucks; refers to the "Mac" character as "Skinny" and "Joe;" and replaces the "Hero of the beach" halo image with "What A Man."

miniseries, *id.*, plaintiff maintains that numerous panels of all four issues of *Flex Mentallo* contain the infringing trademark image of Charles Atlas. Plaintiff's Counter–Statement Pursuant to Local Rule 56.1 ("Pl.56.1") ¶ 13.[5] All four issues of *Flex Mentallo* were published, offered for sale and distributed nationwide in the Spring and Summer of 1996. DC has not reissued any issues of the *Flex Mentallo* series since their original distribution. Godfrey Decl. ¶¶ 8–9.

DC did not conceal the publication of *Doom Patrol* No. 42 or of the four issues in the *Flex Mentallo* miniseries. Each of these publications was publicly available for sale in stores. Godfrey Decl. ¶¶ 7–8. Defendant's "DC" trademark, as well as the marks DOOM PATROL or FLEX MENTALLO, clearly appear on the cover of each of those publications. Godfrey Decl. Exs. 1–9. In addition, none of the allegedly copied artwork or dialogue from plaintiff's comic ad has appeared in any advertisements for DC's products, nor did they appear on cover pages of any of the DC comic magazines. Godfrey Decl. Exs. 1–9. The only arguably infringing material to appear on any of the covers or in any of the ads is the image of Flex Mentallo himself. *Id.*

Plaintiff contends that it was unaware of DC's trademark infringement until January 6, 1998, when it received an e-mail from an unknown individual named Ken Kneisel who informed plaintiff that "he heard about Charles Atlas from reading DC Comics' *Flex Mentallo* series." Hogue Aff. ¶ 30; Pl. 56.1 ¶ 27.[6] Plaintiff's counsel then sent a cease and desist letter to DC at plaintiff's direction on January 14, 1998. Hogue Aff. Ex. H. Since then, DC has not utilized the Flex Mentallo character in any of its publications and "has no present plans to reprint or redistribute any of the *Doom Patrol* issues including Flex Mentallo or any issues in the *Flex Mentallo* series." Godfrey Decl. ¶¶ 11–12; Hogue Aff. ¶ 33. *See also* Hogue Aff. ¶ 42; Pl. Mem. at 17 (reciting that DC "aborted" a 1998 trade paperback that would have included the Flex Mentallo character once DC had received Atlas's cease and desist letter).

Plaintiff commenced this action in June of 1999, alleging that defendant infringed on its trademark by misappropriating its comic ad. Plaintiff maintains that its long history of advertising in defendant's comic books, using the very comic ad allegedly infringed upon by DC, renders the confusion of association between Atlas and DC more likely. Now pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Defendant maintains that plaintiff's claims are: (a) time barred by the statute of limitations inasmuch as they arise from the publication of *Doom Patrol* No. 42; (b) legally insufficient in that defendant's use of plaintiff's alleged trademark does not meet the prerequisite requirement of having been used "in commerce;" and (c) contrary to the First Amendment protections accorded to trademark material used in parody.

## DISCUSSION

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106

---

5. Defendant notes that plaintiff does not specifically identify the allegedly infringing panels. Reply Declaration of Glenn Mitchell, April 6, 2000 ("Mitchell Reply Decl.") ¶ 2.

6. We assume, for the purpose of this discussion, that plaintiff's reference in its brief,

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.Mem.") at 12, to the Ken Kneisel e-mail as having been sent in 1997 is a mere typographical error, since its exhibit, Hogue Aff. Ex. G, is clearly dated June 1, 1998.

S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once a motion for summary judgment is properly made, the burden shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505.

**B. *Statute of Limitations***

██ Defendant maintains that plaintiff's claims arising from *Doom Patrol* No. 42, which was published over eight years before plaintiff filed this Complaint, are time barred by a six-year statute of limitations. The Lanham Act established no specific limitations period for unfair competition and false advertising claims. 15 U.S.C. § 1125(a). Therefore, in determining the applicable statute of limitations in an action for unfair competition under the Lanham Act, courts have looked to the most analogous state statute of limitations: the six-year statute of limitations for fraud claims. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996). The limitations period for fraud claims runs for six years from the time plaintiff discovered the fraud or could with reasonable diligence have discovered it. *Id.; Fourth Toro Family Ltd. Partnership v. PV Bak-*

*ery, Inc.*, 88 F.Supp.2d 188 (S.D.N.Y.2000); N.Y. C.P.L.R. § 213(8).[7]

As in comparable cases involving publications, a plaintiff's claim generally accrues upon publication of the work in question. *See, e.g., Shamley v. ITT Corp.*, 869 F.2d 167, 172 (2d Cir.1989) ("A cause of action for defamation accrues when the material is published."); *Rostropovich v. Koch Int'l Corp.*, No. 94 Civ. 2674, 1995 WL 104123, *7 (S.D.N.Y. Mar. 7, 1995) (finding that a claim for improper use of person's name or likeness under New York law accrues "at the time the allegedly offending publication was placed on sale to the public, and no later"); *Olsen v. Newsday, Inc.*, No. CV-87-2283, 1988 WL 69866, *1 (E.D.N.Y. June 6, 1988) (holding that the statute of limitations for an action under 42 U.S.C. § 1983 stemming from the publication of allegedly prejudicial material in a newspaper accrued "the date of publication of the article"); *Cain v. A.P. Govoni*, No. 80 Civ. 1531, 1980 U.S. Dist. LEXIS 14775, *4 (S.D.N.Y. Nov. 6, 1980) (finding that a "cause of action based on publication of an allegedly defamatory article in a periodical of mass circulation accrues on the date publication was officially released or went on sale at newsstands.") (citing *Zuck v. Interstate Pub. Corp.*, 317 F.2d 727 (2d Cir.1963)).

██ *Doom Patrol* No. 42 was openly and notoriously published in 1991, over eight years prior to the commencement of this action. Plaintiff could have, with reasonable diligence, discovered the alleged infringement upon its publication or shortly thereafter. Therefore, all of plaintiff's claims based on *Doom Patrol* No. 42 are barred under all applicable statutes of limitations.

---

**7.** The applicable statute of limitations for plaintiff's second cause of action, trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c)(1), is three years. *DeMedici v. Lorenzo DeMedici, Inc.*, 101 A.D.2d 719, 720, 475 N.Y.S.2d 391, 392–93 (1st Dep't 1984). Likewise, the statute of limitations for violation of New York's Anti–Dilution Statute, N.Y. Gen. Bus. Law § 360–1 (then § 368–d), is three years. *Id.* The statute of limitations for deceptive trade practices under New York Gen. Bus. Law § 349 is also three years. *Netzer v. Continuity Graphic Associates*, 963 F.Supp. 1308, 1323 (S.D.N.Y.1997); N.Y. C.P.L.R. § 214(2).

Plaintiff, citing to the case *Netzer v. Continuity Graphic Associates, Inc.,* 963 F.Supp. 1308, 1323 (S.D.N.Y.1997), argues that the statute of limitations should only begin to toll "when plaintiff first learned of the wrong." Under that theory, Atlas argues that the statute of limitations should have commenced in January, 1998 when plaintiff received the e-mail from Ken Kneisel allegedly informing plaintiff of the infringement. However, plaintiff's reliance on *Netzer* is unavailing.

In *Netzer,* the plaintiff was an individual person who "left the United States for the Middle East" in 1981, "suffered a number of personal difficulties," and "returned to the United States in 1990." *Id.* at 1313–14. The publication that was alleged to have infringed his copyright and trademark rights was a comic book published by a small independent publisher that folded within ten years. *Id.* at 1312. The court found that under these circumstances, the two-year delay between publication and notice fell into the category of when a "reasonably diligent plaintiff would have been put on inquiry." *Id.* at 1315.

In contrast, Atlas is a "phenomenally successful" New York corporation with customers "from every continent except Antarctica." Hogue Aff. ¶¶ 11–12; Comp. ¶ 4. The allegedly infringing material was a nationwide mass-market publication by DC Comics, the "industry leader." *Netzer,* 963 F.Supp. at 1313. More importantly, unlike the individual plaintiff in *Netzer,* Atlas was "a large advertiser in DC comic books, even at the time that the infringing work appeared." Hogue Aff. ¶ 5. Atlas cannot now, as a matter of law, profess ignorance of the publication of the very

comic books in which it has placed millions of dollars of advertising over several decades. *Id.* ¶ 12. A "reasonably diligent plaintiff would have been put on inquiry" upon *Doom Patrol* No. 42's publication in 1991.[8]

In any event, for reasons discussed further, *infra,* defendant is entitled to summary judgment even without reference to the statute of limitations.

## C. The First Amendment and Trademark Law

Defendants have advanced two basic challenges to plaintiff's trademark claims. Both touch on the First Amendment free speech concerns, although one is ultimately a matter of statutory interpretation and the other is directly grounded in the Constitution. The first defense concerns whether DC's use of plaintiff's comic ad falls outside the definition of a use "in commerce" as defined under trademark law because of the comic book's expressive nature. The second defense asserts that, because the comic books at issue in this case parodied plaintiff's comic ad, they are entitled to First Amendment free speech protection.

The Lanham Act is construed narrowly when the unauthorized use of a trademark is made not for identification of product origin but rather for the expressive purposes of comedy, parody, allusion, criticism, news reporting and commentary. *Yankee Publishing Inc. v. News America Publishing Inc.,* 809 F.Supp. 267, 276 (S.D.N.Y.1992). Here, the vehicle of defendant's alleged trademark infringement,

---

**8.** Plaintiff also cannot litigate its way around the statute of limitations by claiming that defendant's 1991 comic book constitutes a continuing violation because of ongoing fan interest in old comic books *see* Affidavit of James Shooter, dated Mar. 22, 2000 ("Shooter Aff.") ¶¶ 7–11, since the alleged harm commenced, was at its most severe, and was open to plaintiff's notice at the time that the *Doom Patrol* No. 42 was published and widely available on newsstands. Defendant does not control the subsequent uses of and reaction to its original publications. Moreover, the fact that DC and others in the comic book industry promote continuity in plot and character development cannot, by itself, transform every DC comic book published into an extension of the original publication. We note in this regard that plaintiff has not pointed to any publication that defendant itself has actually issued using the Flex Mentallo character since the end of his self-titled series in 1996.

a comic book, is undoubtedly an expressive work.

### 1. *Use in Commerce*

As a threshold matter, for a plaintiff to prevail on trademark and other related claims, he or she must show that defendant has used the alleged trademark in commerce. Only a "person who, on or in connection with any goods or services, or any container for goods, uses in commerce" a trademark or false designation of origin, can be found liable for trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The federal dilution statute, 15 U.S.C. § 1125(c), also requires that a defendant make "commercial use in commerce of a mark or trade name." 15 U.S.C. § 1125(c)(4).

"Noncommercial use of a mark," in contrast, is not actionable under the code's federal trademark dilution provisions. 15 U.S.C. § 1125(c)(4)(B). "Noncommercial use" has been defined by some courts to include "parody, satire, editorial, and other forms of expression," even if the use of trademark material "increases sales for a user." *World Championship Wrestling v. Titan Sports, Inc.*, 46 F.Supp.2d 118, 122–23 (D.Conn.1999) (citing, *inter alia*, 141 Cong. Rec. S19310 (daily ed. Dec. 29, 1995); *Dr. Seuss Enterprises v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1574 (S.D.Cal.1996)).

In this case, defendant asks us to find that the Flex Mentallo character, as a parody of plaintiff's comic ad, is not a use "in commerce" as defined by the trademark statutes. Defendant, citing to a California district court case, argues that when the trademark material is used in an expressive work and is not used to promote or sell a product or service, it has not been used "in commerce." *See Felix the Cat Productions, Inc. v. New Line Cinema Corp.*, 2000 WL 770481, 54 U.S.P.Q.2d 1856, 1857–58 (C.D.Cal.2000) (defendants' use of seven-second "Poindexter" cartoon sequence in movie "Pleasantville" did not

infringe plaintiff's trademark rights in cartoon character, since plaintiff's character was not used to sell defendant's movie, nor was the movie's financial success dependant on plaintiff's character).

However, there are circumstances under which courts have found the use of trademark material, even if it arguably parodies the source material, to be actionable under the trademark statutes. For example, courts have found parodies to be subject to the Lanham when they are used to promote a competing product or service. *See, e.g., Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812–13 (2d Cir.1999) (noting that while courts "have accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or a trademarked product, [they] have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product.") (internal citations omitted); *Deere & Co. v. MTD Products*, 41 F.3d 39, 45 (2d Cir.1994).

More directly on point, the Second Circuit has found the use of trademark material by a political group to be subject to the Lanham Act. In *United We Stand America, Inc. v. United We Stand America New York, Inc.*, 128 F.3d 86, 92 (2d Cir.1997), the Second Circuit interpreted the "in commerce" provision of a parallel Lanham Act provision to reflect "Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act." The Court of Appeals found that " 'commerce' means all commerce which may lawfully be regulated by Congress." *Id.* (quoting S.Rep. No. 79–1333 (1946), *reprinted in* 1946 U.S.C.C.A.N. 1274, 1277). Specifically, the Court rejected the approaches taken by a D.C. district court and the First Circuit in defining the "services" component of "in commerce" to exclude the "[p]urveying [of] points of view." *Id.* at 91 (citing *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.1987); *Lu-*

*casfilm Ltd. v. High Frontier*, 622 F.Supp. 931 (D.D.C.1985)).

Instead, the Second Circuit found the proper approach to be to evaluate whether the challenged use of the trademark material was likely to cause confusion. *Id.* at 91–92. Only if defendant's use of plaintiff's mark was "not in a manner that could create confusion as to source, but rather as a part of a message whose meaning depended on reference to plaintiff's product" is defendant free and clear of liability. *Id.* Accordingly, we must evaluate both the defendant's use of plaintiff's trademark material and the likelihood of confusion in order to determine whether liability may attach under the Lanham Act.

### 2. *Parody Defense Standard*

■ Plaintiff's second defense is grounded more directly in the Constitution. Courts applying trademark law to expressive works have found that the expressive element of such works "requires more protection than the labeling of ordinary consumer products" and places on courts the additional duty of weaving First Amendment analysis into the traditional trademark right analysis applicable in purely commercial cases. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 493–4 (2d Cir. 1989).[9]

"[E]ven if plaintiff suffered some trademark [infringement], defendants' rights under the First Amendment to use plaintiff's mark to communicate the message might prevail over plaintiff's rights under the trademark law." *United We Stand America*, 128 F.3d at 91. "Satirists, selling no product other than the publication that contains their expression, may wish to parody a trademark to make a point of

social commentary, . . . to entertain, . . . or perhaps both to comment and entertain. Such uses risk some dilution of the identifying or selling powers of the mark, but that risk is generally tolerated in the interest of maintaining broad opportunities for expression." *Deere & Co.*, 41 F.3d at 44 (*citing, inter alia, Girl Scouts of the U.S. v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969)).[10]

At the same time, the Second Circuit has stated that "[t]he purchaser of a book [or in this case, comic book] like the purchaser of a can of peas, has the right not to be misled as to the source of the product." *Rogers v. Grimaldi*, 875 F.2d 994, 997–98 (2d Cir.1989). Courts must therefore balance "the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes*, 886 F.2d at 494. This approach "takes into account the ultimate test of trademark law, namely, the likelihood of confusion as to the source of the goods in question." *Id.* at 495 (citations omitted). It also "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work being parodied." *Id.*

In effect, both of DC's asserted defenses ultimately lead to the same analysis, the question of whether defendant used the mark for an expressive purpose, or to create an incorrect association in order to confuse the public. *See United We Stand America*, 128 F.3d at 93.

### 3. *First Amendment Value of Defendant's Publication*

■ Parody has been defined as a "literary or artistic work that imitates the

---

9. *See also Restatement (Third) of Unfair Competition* § 25 cmt. i (1995) (The "use of another's trademark, not as a means of identifying the user's own goods or services, but as an incident of speech directed at the trademark owner, . . . raises serious free speech concerns.").

10. Parody is merely an example of the types of expressive content that are given First Amendment deference under the trademark law. Not only parody, but use of a trademark in communicating an expressive or editorial message generally, is accorded First Amendment deference. *Cliffs Notes*, 886 F.2d at 494; *Yankee Publishing*, 809 F.Supp. at 279.

characteristic style of an author or a work for comic effect or ridicule," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580, 114 S.Ct. 1164, 127 L.Ed.2d 500 (quoting *American Heritage Dictionary* 1317 (3d ed.1992)), and as an "imitation of a work more or less closely modeled on the original, but turned so as to produce a ridiculous effect." *Yankee Publishing*, 809 F.Supp. at 279 n. 11 (quoting *Oxford English Dictionary*, Compact Edition (1971)).[11] Here, DC's Flex Mentallo comic books imitate plaintiff's comic ad and take it to an absurd conclusion. It is an undeniable twist on plaintiff's comic ad for the once weak character to gain strength only to himself become a brute and a bully. Moreover, the use of women in plaintiff's comic ad to reflect a "real man's" physical strength is taken to the extreme with Flex Mentallo's outright misogynistic acts. In effect, the character Flex Mentallo is a farcical commentary on plaintiff's implied promises of physical and sexual prowess through use of the Atlas method.

Despite plaintiff's legal arguments to the contrary, the factual exhibits provided by plaintiff only support this proposition. According to the affidavit of Atlas's president, the Flex Mentallo character "darkly diverges and in a misogynist (and un-Atlas) manner from the Atlas trademark comic-ad. Mac, intoxicated by his new physical prowess, becomes . . . a boor who mistreats women." Hogue Aff. ¶ 29. Plaintiff's expert, James Shooter, describes Flex Mentallo's author, Grant Morrison ("Morrison"), as being known for "his somewhat dark and surreal style," Shooter

Aff. ¶ 18, and using an "ironic juxtaposition of fantasy and reality." *Id.* ¶ 19. This court fails to discern a substantive difference between "surrealism" or "irony" on one hand, and "parody" on the other, much less do we find them to be mutually exclusive.

The Internet criticism of Flex Mentallo supplied by plaintiff further supports the view of the character as commentary on the comic book industry generally, and Atlas specifically. *See* <http://www.cwrl.utexas.edu/ ~craft/flex/ background.html>, appended to Hogue Aff. as Ex. J. It describes Flex Mentallo as a "reaction" to the "Dark Age" of comic books, which was characterized by depictions of superheroes as "often tortured, morally ambiguous and sometimes violent figure[s]." *Id.* "Flex the character and *Flex Mentallo* the series display Morrison's protest against these trends in superhero comics as an ongoing medium." *Id.* He "represents Morrison's argument for a space beyond critique." *Id.* Whether or not we agree with Morrison's view (or this expression of it), or find it "funny," this is precisely the type of expression of ideas that the First Amendment is designed to protect.[12]

DC used plaintiff's comic ad not to advance a competing product, but rather as part of a comic book storyline, to convey an idea through a literary/artistic work. The direct copying of the art and dialogue of plaintiff's trademark comic ad, whether in the registered or unregistered form, was limited to the interior of *Doom Patrol*

---

11. *See also id.* (alternately defining parody as a "literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule" (quoting *American Heritage Dictionary* (2d ed.1982)), and as a "writing in which the language and style of the author or work is closely imitated for comic effect or in ridicule often with certain peculiarities greatly heightened or exaggerated." (quoting *Webster's Third New International Dictionary* (1976))).

12. Plaintiff argues that the Flex Mentallo character cannot be a parody of its comic ad

because DC's promotional materials for the character "make absolutely no mention of parody or satire." Pl. Mem. at 17. However, the analysis of whether an expressive work constitutes parody does not depend exclusively on proper labeling. *See Cliffs Notes*, 886 F.2d at 495–96 (holding that the joke need not be "obvious"). Although such labeling would have strengthened DC's defense, *see id.* at 496, trademark law does not require the use of "magic words," nor would such words automatically insulate an otherwise infringing work from trademark liability.

No. 42, where it served to anchor a parody of that comic ad. The ad's reflection in subsequent iterations of the Flex Mentallo character served to identify and focus further commentary on the comic book industry through the vehicle of this absurdist take on the familiar character. As such, we find that defendant's use of plaintiff's ad to be a form of expression, protected by the First Amendment.

### 4. *Likelihood of Confusion*

Against this expressive usage of plaintiff's comic ad, we must balance the question of whether the Flex Mentallo character is likely to cause confusion on the part of consumers. *Yankee Publishing,* 809 F.Supp. at 276–77 (describing the Second Circuit's "balancing test" for trademark cases that implicate First Amendment values). Likelihood of confusion as to the product's source is an essential element of a claim under § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A); *Two Pesos, Inc. v. Taco Cabana,* Inc., 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 45 (2d Cir.2000).

In analyzing the likelihood of confusion in trademark cases, the Second Circuit applies the eight factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). *See Nabisco,* 220 F.3d 43, 45–46. The *Polaroid* factors are:

    (i) the strength of plaintiff's mark;

    (ii) the similarity of the parties' marks;

    (iii) the proximity of the parties' products in the marketplace;

    (iv) the likelihood that the prior user will bridge the gap between the products;

    (v) actual confusion;

    (vi) the defendant's good or bad faith in adopting the mark;

    (vii) the quality of defendant's product; and

    (viii) the sophistication of the relevant consumer group.

*Polaroid Corp.,* 287 F.2d at 495.

However, the Court of Appeals has cautioned that "the evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco,* 220 F.3d 43, 45–46 (finding no genuine issue of material fact as to whether consumers are likely to confuse the source of the parties' respective chewing gums) (*quoting Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 584 (2d Cir.1993) (internal quotation marks and citation omitted).

Here, in applying the *Polaroid* factors, we find that any likelihood of confusion is minimal. At least four factors clearly favor defendant. First, DC and Atlas occupy "distinct merchandising markets." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 504 (2d Cir. 1996). DC's comic books are simply not in direct competition with Atlas's bodybuilding course. As a result, the likelihood of confusion is greatly reduced. *See id.; New York Stock Exchange Inc. v. New York, New York Hotel, L.L.C.,* 69 F.Supp.2d 479, 484 (S.D.N.Y.1999) (finding that the fact that plaintiff and defendant "do not directly compete, and they offer different services, [ ] substantially reduces the likelihood" of confusion).

Second, Atlas's own expert describes comic book readers as extremely conscientious and knowledgeable about the details of the histories and origins of comic book characters. *See* Shooter Aff. ¶ 7. This sophistication clearly favors DC. *See Yankee Publishing,* 809 F.Supp. at 275 ("The more sophisticated the consumers are with respect to the products in question, the less likely they are to be confused by a similarity."). Although Atlas's ads are undoubtedly familiar to comic book readers because Atlas places its ads in comic books, readers who "strive to learn the [comic

book] history that they have missed," *see* Shooter Aff. ¶ 8, can surely discern between the original Atlas ads and their parodic reflection.[13]

Third, we find it unlikely that plaintiff will "bridge the gap" between the products. "Bridging the gap refers to the 'senior user's interest in preserving avenues of expansion and entering into related fields.'" *Hormel Foods*, 73 F.3d at 504 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985)). Atlas has shown no intention of producing its own comic books using either the Mac character or the character of Charles Atlas himself.[14] As a result, this factor favors DC as well. *See id.* (citations omitted).

Fourth, although plaintiff has introduced some evidence of actual confusion, such evidence is anecdotal at best, and does not purport to constitute any kind of systematic survey. *See New York Stock Exchange*, 69 F.Supp.2d at 485–86 (finding no likelihood of confusion based on two apparently confused survey responses and two newspaper articles). To the contrary, according to plaintiff, it was not even aware of any confusion until seven years after *Doom Patrol* No. 42 was published. Hogue Aff. ¶ 30. This is a "very significant deficiency." *Yankee Publishing*, 809 F.Supp. at 274–75 (finding evidence of actual confusion to be unreasonable given that "many *months* have passed" since publication of an allegedly infringing magazine) (emphasis added). As in *Yankee Publishing*, if the Flex Mentallo character "were really confusing, one would expect to find [comic book] buyers who had been confused by it and had written or telephoned ... to complain or inquire." *Id.* The fact that Atlas claims not to have noticed until *seven years* later "is a strong

indicator that the [Flex Mentallo character] did not create a significant likelihood of confusion because [DC] was successful in conveying that the reference to [Atlas] was a [parody], and not a source identifier." *Id.*

Also, plaintiff has not proffered evidence, beyond conclusory allegations, that DC's parody of the Atlas character was done in bad faith. This also favors defendant. *See New York Stock Exchange*, 69 F.Supp.2d at 487. There is no indication why DC, which publishes some of the bestselling comic books in the world, would particularly gain from nefariously capitalizing on plaintiff's creation. *See Hormel Foods*, 73 F.3d at 505 (finding that defendant entertainer "would have absolutely nothing to gain from creating a confusion among [consumers by] causing them to believe there was a business association between" them) (quoting *Yankee Publishing*, 809 F.Supp. at 275).

Plaintiff's argument that DC's bad faith is evinced by its decision to forgo publication of a planned Flex Mentallo paperback after receiving plaintiff's cease and desist letter is unavailing. We refuse to infer bad intent from DC's decision to accommodate Atlas's request. To the contrary, since DC has represented that it has no intention to use the Flex Mentallo character again, the likelihood of confusion in the future is even further reduced.

Against this is balanced two factors which undeniably favor plaintiff: the strength of its comic ad's mark, and the degree of its similarity to defendant's character. However, as the Second Circuit has noted, "a parody is entitled 'at least' to conjure up the original and can do more." *Cliffs Notes*, 886 F.2d at 495 (quoting *Elsmere Music, Inc. v. N.B.C.*, 623 F.2d 252,

---

**13.** Moreover, we note that the 1996 *Flex Mentallo* mini-series was clearly marked "For Mature Readers." Godfrey Decl. Exs. 2–4. This implies that the miniseries skewed to an even older demographic audience than the typical comic book, which are undeniably read by children and teenagers.

**14.** Although plaintiff's brief, Pl. Mem. at 8, makes passing reference to the fact that "Atlas had a comic book subsidiary at one point," this is not evidence of Atlas's future intention.

253 n. 1 (2d Cir.1980)). "[T]he use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff." *Yankee Publishing*, 809 F.Supp. at 282 (internal citation and quotation marks omitted).[15]

The fact that DC, as well as Atlas, has a well-recognized, prominently featured trademark in its own right further reduces the likelihood of confusion. *See Hormel Foods*, 73 F.3d at 503 ("Where the plaintiff's mark is being used as part of a jest or commentary... [and] both plaintiff['s] and defendant's marks are strong, well-recognized and clearly associated in the consumers' mind with a particular distinct ethic ... confusion is avoided.") (quoting *Yankee Publishing*, 809 F.Supp. at 273); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) ("[T]he prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other *Polaroid* factors.").[16]

■ The likelihood of confusion is therefore slim, and is clearly outweighed by the public interest in parodic expression. As a result, summary judgment must be granted to the defendant.[17]

## E. *Plaintiff's Pendent State Law Claims*

Plaintiff's pendent state law claims under New York's anti-dilution statute, its deceptive trade practices statute, and its common law of unfair competition are likewise dismissed because they are based on the same permissible conduct. *See Yankee Publishing*, 809 F.Supp. at 282 (finding that the "same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.").[18]

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety. Defendant's motion for sanctions under Rule 11 is denied. The Clerk of the Court is respectfully directed to enter judgment in favor of the defendant and close the above-captioned case.

**IT IS SO ORDERED.**

■

---

**15.** *See also Deere & Co.*, 41 F.3d at 44 ("Satirists, selling no product other than the publication that contains their expression, may wish to parody a trademark to make a point of social commentary ... to entertain ... or perhaps to both comment and entertain. Such uses risk some dilution of the identifying or selling powers of the mark, but that risk is generally tolerated in the interest of maintaining broad opportunities for expression.").

**16.** Moreover, as defendant's counsel pointed out in oral argument before this Court, the use of a muscle-bound Caucasian character with dark hair and leopard-skin trunks is not exclusive to Charles Atlas inasmuch as it also describes Edgar Rice Burroughs' creation, "Tarzan," the "Lord of the Apes," who has been the subject of countless books, films, television shows, cartoons, and comic books, dating from 1912 to the present day. As a result, it is even less likely that the readers would mistake Flex Mentallo for an official publication of Atlas.

**17.** Defendant also moved for sanctions under Fed R. Civ. P. 11. The decision of whether to award sanctions pursuant to Rule 11 is subject to the Court's discretion. *See Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir.1999). Although we have found an award of summary judgment to be appropriate in this case, we also find that Atlas's complaint was not frivolous and that it was not clear under existing legal precedent that it had no chance of success or that it was filed solely for the purpose of harassment. *See Kalnit v. Eichler*, 99 F.Supp.2d 327, 344 (S.D.N.Y.2000). Accordingly, the motion for Rule 11 sanctions is denied.

**18.** In light of the above we find that it is not necessary to address several other arguments advanced by defendant and offer no opinion one way or the other on their merits.