## WORLD CHAMPIONSHIP WRESTLING, Plaintiff,

v.

## TITAN SPORTS, INC., d/b/a The World Wrestling Federation, and USA Network, Defendants.

### Nos. Civ. 396CV01139PCD, Civ. 3:98CV925PCD.

United States District Court, D. Connecticut.

March 29, 1999.

Mary A. Gambardella, Epstein, Becker & Green, P.C., Stamford, CT, Jerry McDevitt, Franklin B. Molin, Kirkpatrick & Lockhart, Pittsburgh, PA, for plaintiff and counter-defendant, Titan Sports, Inc.

David Dunn, Jeanne Edna Thelwell, Davis, Scott, Weber & Edwards, New York City, James T. Shearin, Sheila Anne Denton, Aimee Jennifer Wood, Pullman & Comley, Bridgeport, CT, for defendants and counter-claimants, Turner Broadcasting Systems, Inc., World Championship Wrestling, Inc., and Eric Bischoff.

Peter N. Wang, Robert A. Scher, Friedman, Wang & Bleiberg, New York City, Dorit S. Heimer, Stephen Thomas Vehslage, Jr., Levett, Rockwood & Sanders, Westport, CT, for defendant, USA Networks.

### RULING ON MOTION TO DISMISS

DORSEY, District Judge.

Defendants Titan Sports, Inc., ("Titan"), World Wrestling Federation ("WWF") and USA Network ("USA") (collectively referred to as "Defendants") move to dismiss Plaintiff World Championship Wrestling's ("WCW") complaint pursuant to FED. R.CIV.P. 12(b)(6).

## I. BACKGROUND FACTS

The following facts alleged in the Complaint are taken as true. Plaintiff WCW is a Georgia corporation that competes directly with WWF in televising professional wrestling, associated merchandising, and licensing programs. Defendant Titan is a Delaware corporation with its principal place of business in Connecticut. Defendant promotes live, and on cable, syndicated, and pay-per-view television, professional wrestling under its registered service mark "World Wrestling Federation" ("WWF"). Defendant USA is a New York General Partnership that is wholly owned by a corporation organized under the law of the state of Delaware, with its principal place of business in New York. Its holdings include a cable television network, also known as USA Network, which broadcasts Defendant Titan's WWF programming. USA has consulted with Titan over the content of WWF programming, and exercises a certain amount of control over the content of the WWF programming. Plaintiff and defendant both promote professional wrestling through their own television programs, pay-per-view shows, live arena shows, magazines and other merchandise in direct competition with each other.

Plaintiff WCW was formed in 1988. During the early years of its existence, plaintiff was generally overshadowed by the WWF in the professional wrestling industry. In 1994, plaintiff signed Hulk Hogan—one of the better known characters in professional wrestling—and from that point on it began to pose more serious competition for WWF as the leader of professional wrestling promotions. In September 1995, plaintiff introduced a live, prime time cable television program that aired at the same time as defendants' similar program. Plaintiff's program received comparable ratings to that of defendants', and posted higher ratings during several weeks in 1995.

In response to plaintiff's success, defendant Titan began a "campaign" of unfair

competition against plaintiff "by disparaging WCW and the wrestlers who appear on its programs." Complaint ¶ 11. Defendant ran a series of sketches that featured a "Billionaire Ted" character, the owner of plaintiff company, Ted Turner. Through "programming stunts," defendant deliberately attempted to mislead its audience into thinking that two well-known wrestlers, Scott Hall and Kevin Nash, who had left the WWF in 1996 to appear exclusively for plaintiff WCW, would return to the WWF and wrestle for it under their prior ring names, "Razor Ramon" and "Diesel." Id. Plaintiff also complains of (1) comments made on the air by WWF broadcasters denigrating the WCW, its performers and its executive personnel; (2) creation, promotion and exhibition of WWF television programs, aired on USA, which used clips from old WWF programs featuring former WWF wrestlers who are under exclusive contract with plaintiff without disclosing that the wrestlers were no longer with the WWF; (3) publication of "fantasy matches" in the WWF's official magazine in which wrestlers under exclusive contract with plaintiff are portrayed in hypothetical wrestling matches against current WWF wrestlers again without disclosing that the WCW wrestlers were not affiliated with WWF; and (4) a staged "attack" on a WCW event during which WWF wrestlers verbally denigrated plaintiff and its wrestlers, accosted plaintiff's fans while they were waiting in line to see plaintiff's show, and claimed that Hall and Nash wanted to return to the WWF, but were being prevented from doing so by plaintiff. Id.

Beginning in early 1996, the WWF "has engaged in a continuing scheme to disparage the WCW and Nitro trademarks, and to exploit and exacerbate consumer confusion with respect to the affiliation of professional wrestlers under contract to WCW and as to the source, origin, and sponsorship of certain professional wrestling programming." Complaint ¶ 15.

"WCW" is a common law trademark or servicemark of plaintiff World Championship Wrestling. "WCW Monday Nitro" is a registered trademark of plaintiff. The professional wrestling audience associates plaintiff and its marks with exciting and high quality professional wrestling programming, plaintiff alleges. "WCW" is a "famous" mark covered by Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Plaintiff also claims exclusive rights via independent contractor agreements with a number of wrestlers, including Terry Bollea ("Hulk Hogan") and others, to utilize their voices and likenesses to promote professional wrestling worldwide.[1]

Plaintiff alleges that defendant's actions have infringed upon plaintiff's trademark rights and its rights to exploit exclusively the trademarks and servicemarks of individual wrestlers assigned to plaintiff during the term of their contracts to perform for WCW, diluting and blurring the distinctiveness of plaintiff's trademarks. Additionally, plaintiff claims that defendants' actions constitute unfair competition against plaintiff. Defendant USA has been complicit in these actions and has aided and abetted defendant Titan through broadcasting its programs to millions of viewers nationwide, plaintiff alleges.

In a five count complaint, plaintiff pleads violations of Section 43(c) of the Lanham Act, the Connecticut Unfair Trade Practices Act ("CUTPA"). CONN.GEN.STAT. § 41-110a et seq., and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and seeks damages and injunctive relief. Defendants move to dismiss the complaint in its entirety.

1. For some of the wrestlers, plaintiff also has the exclusive right to use ring names that are common law or registered trademarks that they own. Plaintiff has a license to use the mark "Hulk Hogan" exclusively for wrestling and wrestling-related services. Plaintiff states that "Ric Flair," "Hulk Hogan," "Rowdy Roddy Piper," and "Macho Man Randy Savage" are famous marks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss should be granted only when "it appears beyond a doubt" that a plaintiff fails to state any claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All facts alleged in the complaint are presumed to be true and are considered in the light most favorable to the non-movant. *Williams v. Avco Lycoming,* 755 F.Supp. 47, 49 (D.Conn.1991).

As an initial matter, defendants assert that the Complaint should be dismissed because it is untimely. Defendants claim that this case is plaintiff's thinly disguised attempt to get around scheduling deadlines set in the lead case in this consolidated action, *Titan Sports v. Turner Broadcasting, et al.,* for filing counterclaims and joining additional parties. Plaintiff contends that the injurious acts in the complaint occurred after the deadlines in the first action. See Complaint, ¶¶ 19, 21, 22–28. For this reason, plaintiff's complaint is not untimely.

### B. Count I—Trademark Dilution

#### 1. Standing

■ Defendants move to dismiss Count One of the Complaint alleging trademark dilution because plaintiff does not own the marks claimed to be violated; the marks of "Ric Flair," "Hulk Hogan," "Macho Man Randy Savage," and "Rowdy Roddy Piper" are owned by the wrestlers, who have exclusively licensed them for use to plaintiff. Defendant argues that a licensee, as opposed to an owner, does not have standing to assert a violation of Section 43(c) of the Lanham Act.

The subsection of the statute only refers to the "owner of a famous mark" in its provisions for relief. *See* 15 U.S.C. Sec. 1125(c)(1). The only court that has specifically addressed this issue reviewed the provisions of the licensing contract to de-termine what the nature of the licensee's ownership rights in the trademark were and held that "plaintiff, as the exclusive licensee but not the owner of the marks at issue . . ., lacks standing to pursue a claim under 15 U.S.C. Sec. 1125(c)." *See STX, Inc. v. Bauer USA, Inc.,* No. C 96–1140 FMS, 1997 WL 337578, at *3–4 (N.D.Cal. June 5, 1997). Although the court's determination of this issue is persuasive, its holding was based on a fact-specific review of the licensing agreement in relation to a motion for summary judgment. If plaintiff can show that its licensing agreement with the wrestlers provides greater ownership rights in their marks than the one at issue in *STX,* plaintiff may have standing to assert this claim. Construing the references to the licensing agreement in the Complaint in a light most favorable to plaintiff, the trademark dilution claim will not be dismissed for lack of standing at this stage.

#### 2. First Amendment defenses/ "expressive" uses

■ Additionally, defendants argue that the trademark dilution claim should be dismissed because their use of the marks is not for commercial purposes, but should be considered "expressive," which is exempted from the Lanham Act and protected by the First Amendment. 15 U.S.C. § 1125(c)(4)(B) provides: "The following shall not be actionable under this section: (A) Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark. (B) Noncommercial use of a mark. . . ." Section 1125(c)(4)(B) was defined by Senator Hatch in introducing the bill to include "parody, satire, editorial and other forms of expression that are not part of a commercial transaction." 141 Cong. Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch). The classic example of commercial speech is an advertisement that "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60,

66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (internal citation omitted). On the other end of the spectrum lies purely artistic speech. Between advertisement and art, there exists

> various forms of speech that combine commercial and noncommercial elements. Whether a communication combining those elements is to be treated as commercial speech depends on factors such as whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication.

*Bad Frog Brewery, Inc. v. New York State Liquor Authority,* 134 F.3d 87, 97 (2d Cir. 1998).

▪ An expressive use does not become a commercial use solely because the use increases sales for a user. *Dr. Seuss Enterprises v. Penguin Books USA, Inc.,* 924 F.Supp. 1559, 1574 (S.D.Cal.1996). But when the unauthorized use is done *"for the purpose of source identification,* the trademark law generally prevails over the First Amendment." *Yankee Pub. Inc. v. News America Pub. Inc.,* 809 F.Supp. 267, 276 (S.D.N.Y.1992) (emphasis in original). If the unauthorized use of a mark is for expressive purposes implicating the First Amendment, as defendants claim, the rights of the trademark owner must be weighed against the interests of free speech. *Id.* (citations omitted). *Accord: Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir.1989).

▪ Defendants' cite cases that they argue require that their actions be found to be protected by the First Amendment. *See Dr. Seuss,* 924 F.Supp. 1559 (finding that parody of Dr. Seuss style in book about O.J. Simpson murder trial was not a commercial use, was protected by First Amendment and exempt under § 43(c) but upholding injunction under § 43(a)); *Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161 (C.D.Cal.1998) (holding that "Bally Sucks" website for lodging complaints about plaintiff company was in noncommercial setting and was not actionable under anti-dilution statute). Plaintiff points to cases which it argues mandates the opposite result. *See Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39 (2d Cir. 1994) (upholding injunction barring airing of defendant's television commercial that turned plaintiff's trademark deer into a skittish animal that ran from defendant's trademark based on trademark dilution); *Harley–Davidson v. Grottanelli,* 164 F.3d 806 (2d Cir.1999) (holding that parody defense did not apply to motorcycle repairer's use of plaintiff's bar and shield in logo).

None of these cases clearly encompass the situation here. The world of professional wrestling seems to be a hybrid of expressive performance and advertisement, with wrestlers trading insults, performing attention-getting stunts and challenging each other to fights in the hopes of attracting viewers. The balancing test called for in the case law involves factual and legal issues which cannot be disposed of at this stage in the case. The motion to dismiss the claim on this basis is denied.

### C. Count II—Product Disparagement under CUTPA

▪ CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN.GEN.STAT. § 42–110b(a). To determine whether conduct is "unfair," a court must consider whether the practice (1) "offends public policy as it has been established by statutes, the common law, or otherwise;" (2) "is immoral, unethical, oppressive, or unscrupulous;" and (3) "causes substantial injury to consumers [ (competitors or other businessmen) ]." *Boulevard Associates v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1038 (2d Cir.1995) (citations and internal quotations omitted). All three criteria need not be satisfied to support a finding of unfairness. *Omega Engi-*

*neering v. Eastman Kodak,* 908 F.Supp. 1084, 1099 (D.Conn.1995) (internal citation omitted). A practice may be unfair because of the degree to which it meets one of the criteria or because, to a lesser extent, it meets all three. *Id.* (internal citation omitted). A violation of the Lanham Act establishes liability under CUTPA. *See Nora Beverages, Inc., v. Perrier Group of America, Inc.,* 164 F.3d 736, 751 (2d Cir.1998); *Timex Corp. v. Stoller,* 961 F.Supp. 374, 381 (D.Conn.1997).

█ Defendants assert that this claim should be dismissed because their actions are protected by the First Amendment and because a claim alleging product disparagement under CUTPA must be based on specific false or misleading statements of fact. Defendants claim that the Complaint solely incorporates opinion statements and factual statements not alleged to be false in support of this claim.

First, defendants allege that since WCW is a limited purpose public figure, defendants' allegedly disparaging statements are entitled to the highest level of First Amendment protection. As discussed in Section 1, B(2), it is not yet clear whether defendants' actions are protected by the First Amendment. Additionally, even if defendants' speech implicates the First Amendment, plaintiff's interests must still be weighed against the public interest of free speech to determine whether they have violated the Lanham Act. *Rogers v. Grimaldi,* 875 F.2d at 999.

Defendants' assertion that the Complaint does not allege specific false or misleading statements of fact, but only opinion statements and "true" factual statements

that are not actionable is contradicted by the pleadings. Paragraph 37 of the Complaint alleged that defendants' repeated denigration of plaintiff's programming and personnel and use of the "WCW" mark in negative material constitute disparagement of plaintiff's product. Paragraph 19 of the Complaint states in part that "WWF presented a diatribe disparaging WCW and WCW's performers, cast in the form of a statement by Jim Cornette, a member of the WWF Booking Committee." Paragraph 22 alleges in part that a wrestler who had been terminated by plaintiff appeared on defendants' program and stated, "[WCW wrestlers] Kevin Nash and Scott Hall would be standing right here with us if they weren't being held hostage by World Championship Wrestling, and that's a fact . . ." Paragraph 23 alleges that when plaintiff and defendants were putting on separate live shows in arenas minutes away from each other, defendants' wrestlers went to plaintiff's site and harangued customers who were waiting in line to see plaintiff's show. This stunt was broadcast by defendants later that night. Complaint, ¶ 23.

Additionally, the statements that defendants claim are unactionable opinions are not so clear-cut from the face of the Complaint. Construing all allegations in favor of plaintiff, it cannot be said that plaintiff fails to state any claim under CUTPA upon which relief may be granted. For this reason, defendants' argument that Paragraph 24[2] fails to state a claim under CUTPA and should be dismissed is also denied.

---

2. Paragraph 24 states
 . . . Titan wilfully and maliciously represented falsely that WCW was offering free tickets to its *Nitro* event in Norfolk. In the professional wrestling business, the giving away of free tickets to an event on the day of the show is a response to a failure to sell out a venue, and it reflects badly on a promotion, suggesting that an insufficient number of fans are willing to pay to see the show. WCW had in fact sold out the Nor-

folk event far in advance. Titan falsely and maliciously telecast video footage suggesting that tickets were being given away by the juxtaposition of an unrelated message on the marquee of the Scope with the message announcing that evening's *Nitro* event. This maliciously altered footage was replayed on the May 2 *Live Wire* and the *WWF Superstars* that appeared on USA on May 3.

### D. Count III—"Confusing Sponsorship" Claim

 Defendants move to dismiss Count III alleging "confusing sponsorship" in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[3] Defendants argue that the public could not possibly be confused about the origin of their obviously disparaging remarks.

Defendants rely on *Ballet Makers, Inc. v. United States Shoe Corp.*, 633 F.Supp. 1328, 1334 (S.D.N.Y.1986) to emphasize that "the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark" is the controlling element in this claim. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200 (2d Cir.1979), a case involving defendant's parody in a pornographic film of plaintiff's famous cheerleaders, the Second Circuit rejected defendant's claim that no reasonable viewer would believe that the film originated with plaintiff. The appellate court stated that defendant read the confusion requirement too *narrowly*. *Id.* at 204. The court noted that the uniform in defendants' film unquestionably brought to mind plaintiff's cheerleaders, and that "it is hard to believe that anyone who had seen defendants' sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders. This association results in confusion which has 'a tendency to impugn (plaintiff's services) and injure plaintiff's business reputation ...'" *Id.* at 205 (citing *Coca–Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972)). "[W]here it is shown that the alleged infringer used the mark knowingly and with the intention of deriving some benefit from it, a strong inference of probable confusion arises, and all doubts are resolved against defendant."

*Wendy's International v. Big Bite, Inc.* 576 F.Supp. 816, 822 (S.D.Ohio 1983) (finding that the likelihood of confusion was higher in cases of direct competition).

With these standards in mind, plaintiff's claim under Section 43(a) of the Lanham Act withstands dismissal. Even though defendants may be correct in asserting that the public would not think that the WCW created the program at issue, plaintiff's allegations adequately plead that the public may think that the WCW otherwise approved the denigration of its marks on defendants' program and that it was injured by defendants' use. See Complaint ¶ 40.

### E. Counts IV & V—"Flashback" Lanham Act and CUTPA Claims

 Defendants' move to dismiss Counts IV and V, which allege that defendants' use of the likenesses of current WCW wrestlers to promote their television programming and in their magazines is likely to cause confusion, mistake and deception as to the affiliation, connection and association of the parties and as to the sponsorship or approval of the programming in violation of Section 43(a) of the Lanham Act and CUTPA. Specifically, plaintiffs' challenge defendants' rebroadcast in new programs of old clips of wrestlers who currently perform exclusively for plaintiff. It also objects to defendants' publication of "fantasy matches" in defendants' official magazine in which plaintiff's wrestlers are portrayed in hypothetical wrestling matches against defendants' wrestlers.

Defendants assert that since they own copyrights in the old television clips and wrestlers' past likenesses, their ownership

---

**3.** The subsection reads

[a]ny person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person ...

15 U.S.C. § 1125(a)(1)(A).

rights trump any exclusive rights of promotion plaintiff holds and their use cannot amount to trademark infringement under the Lanham Act. The cases that defendants rely on held that recorded broadcasts of NBA games are entitled to copyright protection and that copyrights preempt any competing state law rights if the competing state law claim is equivalent to any bundle of rights already protected by copyright law. *National Basketball v. Motorola, Inc.*, 105 F.3d 841 (2d Cir.1997); *Baltimore Orioles v. Major League Baseball Players Ass.*, 805 F.2d 663 (7th Cir. 1986). However, the right at issue here is plaintiff's right to be free of trademark infringement and confusion under a federal act. As the Second Circuit has held, a copyright is not a license to engage in unfair competition. *Federal Trade Commission v. Real Products Corp.*, 90 F.2d 617, 619 (2d Cir.1937) (holding that use by car manufacturers, without consent of Champion Spark Plug Company, of trade designation "Champion" for their automotive and metal specialties, including spark plug cable sets, constituted unfair competition, where use of word was false, deceptive, and misleading to retail trade and purchasing public, despite fact that manufacturers had copyright in label); *see also, Factors Etc., Inc. v. Pro Arts, Inc.*, 496 F.Supp. 1090, 1100 (S.D.N.Y.1980), *rev'd on other grounds*, 652 F.2d 278 (2d Cir. 1981) ("The right of publicity, firmly supported by the Supreme Court and the Second Circuit, would be severely undermined if it could be so easily circumvented by using a photograph or representation allegedly copyrighted or within the public domain."). Even under defendants' standard, it is difficult to determine at this stage the nature of plaintiff's rights and claims under state law based on their contracts with the wrestlers as compared to defendants' copyright rights. Plaintiff's

analogous claim under CUTPA cannot be resolved until the Lanham Act vs. copyright claims are sorted out. The motion to dismiss Counts IV and V is denied.

### III. CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss [docs. # 22, 217–1, 224–1][4] is **denied.** Defendants' Motion to Strike ¶¶ 17, 18, 24, 26, 27 of the Complaint as irrelevant is denied.

SO ORDERED.

---

4. Due to the consolidation of the two actions, defendants' motion has been assigned multiple docket numbers in error.