**BOARD OF SUPERVISORS OF THE LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College, et al.**

v.

**SMACK APPAREL COMPANY, et al.**

No. CIV.A.04–1593.

United States District Court,
E.D. Louisiana.

July 18, 2006.

Jerre B. Swann, Christopher J. Kellner, and R. Charles Henn Jr. of Kilpatrick Stockton LLP, Atlanta, GA, and Stephen Doody of Garvey, Smith, Nehrbass & Doody, Baton Rouge, LA, for Plaintiffs.

James W. Tilly of Tilly & Fitzgerald, Tulsa, OK, and David Henry of Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA, Orlando, FL, for Defendants.

## ORDER AND REASONS

LEMMON, District Judge.

**IT IS HEREBY ORDERED** that plaintiffs' motions for summary judgment are **GRANTED** (Record Document Nos. 86 and 143). IT IS FURTHER ORDERED that Defendants' motion for summary judgment is **DENIED** (Record Document Nos. 45 and 48).

## I. BACKGROUND

Plaintiffs Louisiana State University (LSU), the University of Oklahoma (OU), Ohio State University (OSU), and the University of Southern California (USC), along with their licensing agent, Collegiate Licensing Company (CLC), have sued defendant Smack Apparel Company and its principal, Wayne Curtiss, under the Lanham Act and related state statutes.

The universities each own trademark registrations for both their names and their commonly used initials. Additionally, over a century ago each university adopted a particular color combination as its school colors (purple and gold for LSU, crimson and creme for OU, scarlet and gray for OSU, and cardinal and gold for USC). The universities have spent millions of dollars over the years in marketing and promoting items bearing their initials and school colors. Plaintiffs generally allege that defendants have engaged in unfair competition by selling shirts bearing the distinctive two colors used by the universities, along with other symbols which identify the universities. Among the allegedly

offending designs promulgated by defendants are the following:

● **OU** (2 shirt designs): (1) "Bourbon Street or Bust" (with the "ou" in "Bourbon" in a different typestyle) (front), "Show us your beads!" (with the "ou" in "your" in a different typestyle) and "Sweet as Sugar!" (back) (2) "Beat Socal" (front), "And Let's Make it Eight!"(back). These shirts refer to 2004 Sugar Bowl contest in New Orleans between the OU and LSU football teams. A victory in the Sugar Bowl could have given OU a claim to an eighth national football championship. One of OU's principal rivals to this claim was USC.

● **LSU** (2 shirt designs): (1) "Beat Oklahoma" (front), "And Bring it Back to the Bayou!" and "2003 College Football National Championship" (back) (2) "2003 College Football National Champions" (front), colored circular depiction of game scores, with "2003 College Football National Champions" and "Sweet as Sugar" (back). These shirts refer to the 2004 Sugar Bowl contest in New Orleans between OU and LSU, which was played to determine the Bowl Championship Series national football champion.

● **OSU**: "Got Seven?" (front), "We do! 7 Time National Champs," with depiction of the state of Ohio and a marker noting "Columbus Ohio" (back). This shirt refers to the seven college football national titles claimed by OSU.

● **USC**: "Got eight?" (front), "We Do! Home of the 8 Time National Champions!" and depiction of the state of California with a star marked "SoCal" (back). This design refers to USC's claim to eight college national football championships.

Certain of the shirts also include additional graphics or type, including championship trophies and the scores of football games

in which the universities have competed. The relatively small logo "Smack" appears in an oval on each shirt.

Plaintiffs assert the following claims against defendants: trademark infringement under the Lanham Act, unfair competition under the Lanham Act, unfair trade practices under the Louisiana Unfair Trade Practices Act (as to LSU), federal trademark dilution, state trademark dilution, common law trademark infringement, and common law unfair competition. Plaintiffs have moved for summary judgment on (1) LSU's, OU's, OSU's, and USC's claims for federal unfair competition and common law unfair competition; (2) OU's claim for trademark infringement of its federally registered "OU" mark; (3) plaintiffs' claim for a violation of the Louisiana Unfair Trade Practices Act (LUTPA); and (4) CLC's claims of federal unfair competition, common law unfair competition, and violation of the LUTPA. Defendants also have moved for summary judgment on each of these claims.

## II. ANALYSIS

### A. LSU's, OSU's, OU's, and USC's claims of unfair competition under 15 U.S.C. § 1125(a) and claims of common law unfair competition.

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" which is "likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities." Although the parties have vari- ously referred to plaintiffs' color schemes, logos, and designs on university shirts as being trademarks or trade dress, the unfair competition provision of the Lanham Act protects both trademarks and trade dress. *Sugar Busters, L.L.C. v. Brennan*, 177 F.3d 258, 267 (5th Cir.1999); *see also Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir.1998) ("The same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, regardless of whether they are registered or unregistered."). Additionally, "[a]s a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985).

### 1. Secondary meaning.

Section 43(a) of the Lanham Act "protects qualifying unregistered trademarks," and "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

Under the Lanham Act, a trademark may be registered if it is "capable of distinguishing the applicant's goods from those of others." *Id.* at 768, 112 S.Ct. 2753. A mark's distinctiveness is "often classified in categories of generally increasing distinctiveness;" following the classic *Two Pesos, Inc.* formulation, they may be "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* Generic marks are not entitled to trademark protection, and suggestive, arbitrary, and fanciful marks are inherently distinctive. A mark that is descriptive

may acquire distinctiveness if it "has become distinctive of the applicant's goods in commerce," which is generally called "secondary meaning." *Id.*

Plaintiffs describe their marks as "color schemes in the context of merchandise that makes reference to the Plaintiff Universities or their accomplishments and is directed to their fans and other interested consumers." [1] There is no question that a color scheme may be protectible as a trademark if it "identifies and distinguishes a particular brand (and thus indicates its "source")." *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). In *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), the Supreme Court made clear that under *Qualitex,* color is not protectible without proof of secondary meaning. *Id.* at 211–12, 120 S.Ct. 1339.

Accordingly, plaintiffs must demonstrate that their color schemes, logos, and designs on shirts referring to them or their accomplishments have attained "secondary meaning," which is a shorthand for denoting that "in the minds of the public, the primary significance of a [mark] is to identify the source of the product and not the product itself." *Id.* at 211, 120 S.Ct. 1339.[2]

To acquire a secondary meaning in the minds of the buying public, a labeled product, when shown to a prospective customer, must prompt the reaction,

"That is the product I want because I know that all products with that label come from a single source and have the same level of quality." In other words, the article must proclaim its identity of source and quality, and not serve simply to stimulate further enquiry about it.

As one court stated, "The buyer to be deceived, must be looking for something." That is, the buyer, to be deceived, must be looking for some symbol which he thinks identifies a single, albeit anonymous, source. Without that identification, called "secondary meaning" for non-inherently distinctive terms, there can be no confusion.

J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 15:11, at 15–22 (4th ed.2005); *see also Bretford Mfg., Inc. v. Smith System Mfg. Corp.,* 419 F.3d 576, 579 (7th Cir.2005) ("[W]hen trade dress implies the product's origin it is protected as a trademark (unless it is also functional); but when consumers value the feature for its own sake rather than as a badge of origin, it may be copied freely.").

■ The Fifth Circuit has adopted a seven factor test for establishing secondary meaning:

That a particular mark or trade dress has acquired secondary meaning can be proven by a consideration of the following evidence: (1) length and manner of the use of the mark or trade dress, (2)

---

**1.** Record Document No. 13 at 20; *see also id.* at 2 ("Smack has deliberately copied the school colors of LSU (purple and gold), Oklahoma (crimson and creme), Ohio State (scarlet and gray), and USC (cardinal and gold) in connection with merchandise that refers to the Plaintiff Universities.").

**2.** *See also Sugar Busters,* 177 F.3d at 269 (primary element of secondary meaning is "a mental association in buyer[s'] minds between the alleged mark and single source of the product"); *Zatarains, Inc. v. Oak Grove*

*Smokehouse, Inc.,* 698 F.2d 786, 795 (5th Cir. 1983) ("In assessing a claim of secondary meaning, the major inquiry is the consumer's attitude toward the mark. The mark must denote to the consumer 'a single thing coming from a single source,' to support a finding of secondary meaning."); J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 15:5, at 15–9 (4th ed. 2005) ("The prime element of secondary meaning is a *mental association* in buyers' minds between the alleged mark and a single source of the product.") (italics in original).

volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress. While each of these types of evidence alone may not prove secondary meaning, in combination they may indicate that consumers consider the mark or trade dress to be an indicator of source. In considering this evidence, the focus is on how it demonstrates that the meaning of the mark or trade dress has been altered in the minds of consumers.

*Pebble Beach,* 155 F.3d at 541. Under this test, "the burden of proof rests at all times with the plaintiff, and '[a] high degree of proof is necessary to establish secondary meaning for a descriptive term.'" *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 118 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

■ The court finds that plaintiffs have established secondary meaning in their particular color schemes, logos, and designs. It is undisputed that the universities have used their color combinations for a lengthy period of time.[3] The universities market scores of items bearing their color schemes, logos, and designs, and sales of these items exceed tens of millions of dollars.[4] The universities advertise items with their school colors in almost every conceivable manner, and the record contains ample evidence that the universities' school colors have been referenced numerous times in magazines and newspapers. The universities have even used the colors to refer to themselves, *i.e.,* LSU sometimes refers to itself as the "Purple and Gold." Defendants admit that they selected the color schemes, logos, and designs for their shirts in order to refer to the universities and call them to the mind of the consumer, although defendants deny that they intended to confuse the public into thinking the universities manufactured Smack's shirts. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 663 (7th Cir.1995) (holding that "Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning—so that his copying will indeed facilitate his passing off—is some evidence that the trade dress actually has acquired secondary meaning.").

Applying the Fifth Circuit's test for secondary meaning, the court concludes that there are no genuine issues of disputed material fact, and plaintiffs' color schemes, logos and designs have achieved secondary meaning.

### 2. Likelihood of confusion.

■ To determine whether there is infringement under both the Lanham Act and the common law tort of unfair competition, if a color scheme, logo, or design has acquired secondary meaning, the next step is to determine likelihood of confusion. *See Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 225 (5th Cir.) ("The gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confusion."), *cert.*

---

3. LSU has used its school colors since 1893, Oklahoma since 1895, Ohio State since 1878, and USC since 1895.

4. For example, the declaration of Robert Cleveland, the Assistant Director of Trademarks and Licensing for The Ohio State University, attests that retail sales "of OSU merchandise reflecting use of the scarlet and gray color scheme" exceed $50,000,000.00.

*denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Plaintiffs must demonstrate that the use of its mark by defendant "is likely to cause confusion among consumers as to the source, affiliation, or sponsorship" of defendants' "products or services. A 'likelihood of confusion' means that confusion is not just possible, but probable." *Scott Fetzer Co. v. House of Vacuums, Inc.,* 381 F.3d 477, 483 (5th Cir.2004); *see also Kentucky Fried Chicken v. Diversified Packaging Corp.,* 549 F.2d 368, 382 (5th Cir.1977) (holding that the "determinative question" in applying common law tort of unfair competition is "whether the tortfeasor's practices are likely to mislead customers into believing that the product emanates from or has been endorsed by the claimant"). The digits of confusion test applies to this issue:

In assessing whether use of a mark creates a likelihood of confusion as to affiliation or endorsement, we consider the "digits of confusion," a list of factors that tend to prove or to disprove that consumer confusion is likely. Those factors are: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion.

The digits are a flexible and nonexhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus. *Scott Fetzer,* 381 F.3d at 484–85. Additionally, in *Sunbeam Products, Inc. v. West Bend Co.,* 123 F.3d 246 (5th Cir.), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998), the court added an eighth digit: the degree of care employed by consumers. *Id.* at 257. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of

confusion.'" *Elvis Presley Enters. v. Capece,* 141 F.3d 188, 194 (5th Cir.1998). The issue of whether a likelihood of confusion exists is a question of fact. *Society of Financial Examiners,* 41 F.3d at 225.

The first digit of confusion, the type of the mark, "refers to the strength of the mark." *Elvis Presley Enters.,* 141 F.3d at 201. "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that to the senior user." *Id.* In assessing this digit, "the trier of fact looks at all third party use, not just use in the same industry, to determine whether a mark is a 'weak' or a 'strong' mark." *Union Nat'l Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas,* 909 F.2d 839, 848 n. 24 (5th Cir.1990). As detailed above, the universities' color schemes, logos, and designs are extremely strong marks that have been used for decades and have acquired secondary meaning in the context of reference to the plaintiffs' universities or their accomplishments, which are directed to their fans and other interested consumers. Although there are many uses of the universities' color schemes, logos, and designs by third parties, there is no indication that any third party used the marks in that context. See *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1545 (11th Cir.1985).

The second digit of confusion, similarity of the marks, is determined by comparing the marks:

The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning. "Even if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant

inquiry is whether, under the circumstances of the use," the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.

*Elvis Presley Enters.,* 141 F.3d at 201. The marks at issue are virtually identical: Smack's shirts bear the same color schemes and similar logos and designs as those of the plaintiffs, and their shirts each bear logos and designs leaving no doubt that they refer to the plaintiff universities. There are instances where consumers have connected Smack's shirts to the universities, believing there to be some affiliation or sponsorship.

Under the third digit of confusion, similarity of products or services, "the greater the similarity between products and services, the greater the likelihood of confusion." *Id.* at 202. Even if products are not directly competing, a likelihood of confusion may exist because consumers may be confused as to the sponsorship, affiliation, or connection between the parties' products. *Id.* at 202. It is undisputed that both Smack and the universities market shirts bearing the same color schemes, logos, and designs. Smack argues that its products differ from those authorized by the universities because, in addition to the respective colors, they include irreverent phrases or slang comments. This argument runs afoul of the principle that a trademark provides protection for one's investment in good will. "The creation of value in a trademark requires 'the expenditure of great effort, skill and ability' and a competitor should not be permitted to take a 'free ride' on the trademark owner's good will and reputation." 1 *McCarthy on Trademarks,* § 2:30, at 2–54 (quoting *Smith v. Chanel, Inc.,* 402 F.2d 562, 568 (9th Cir.1968)). Clearly, "[t]hose who invest time, money and energy in the development of good will and a favorable reputation [should] be allowed to reap the advantages of their investment." *Truck*

*Equipment Serv. Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1215 (8th Cir.1976). Smack's use of irreverent phrases or slang comments misuses the plaintiffs' reputation and good will, which is embodied in their trademarks. Smack may not trade upon or exploit the universities' reputation and goodwill.

The fourth digit of confusion requires analyzing the identity of retail outlets and purchasers. "Dissimilarities between the retail outlets 'lessen the possibility of confusion, mistake, or deception.'" *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 490 (5th Cir.1992). The record reflects that some of Smack's shirts are sold through its own internet website but that others are sold in booths and kiosks set up by retailers near stadiums on the days on which the respective university plaintiffs play football. Smack's shirts also are sold in retail outlets alongside those of the plaintiffs. There is no dissimilarity between retail outlets.

The fifth digit of confusion is the identity of the advertising media used:

> The use of a mark in advertising is highly probative of whether the mark creates a likelihood of confusion in relation to another mark. 'Evidence of the context in which a mark is used on labels, packages, or in advertising material directed to the public is probative of the reaction of prospective purchasers to the mark.' Courts consider marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements.

*Elvis Presley Enters.,* 141 F.3d at 197. Smack admits that it participates in the same trade shows as plaintiffs, and advertises and markets its shirts for sales at those shows. Smack's use if the universities' color schemes, logos, and designs through the advertising of its shirts at the same or similar venues as those used by

the universities creates a likelihood of confusion.

The sixth digit of confusion is intent to confuse customers. *Id.* at 203. Although defendants do not admit they intended to deceive consumers as to the source of their shirts, they admit that they "used school colors and 'other indicia' with the intent of identifying the university plaintiffs as the subject of the message expressed in the shirt design."[5] This factor weighs in favor of likelihood of confusion because defendants used the color schemes, logos, and designs of the plaintiffs with "an intent" to "rely upon the drawing power" in enticing fans of the particular universities to purchase their shirts. *Id.*

The seventh digit, actual confusion, tests whether defendants have used plaintiffs' trademarks, and the public has identified the marks as those of the plaintiffs. The only evidence of actual confusion in this case is survey evidence presented by the plaintiffs.[6] This evidence, however, is hotly contested and unnecessary. It has long been held that actual confusion need not be proved. *Abramson v. Coro,* 240 F.2d 854, 856–57 (5th Cir.1957). Rather, a showing of a likelihood of confusion is sufficient. *Id.*

A likelihood of confusion, the eighth digit, weighs in favor of the plaintiffs. "Confusion is more likely, ... if the products in question are 'impulse' items or are inexpensive." *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 428 (5th Cir.1986). The products at issue in this case are relatively inexpensive shirts, which are not purchased with a high degree of care.

The court concludes plaintiffs have established likelihood of confusion.

### 3. Functionality.

█ A product feature that is functional may not be protected as a trademark or as part of a trade dress. *See Qualitex,* 514 U.S. at 164–65, 115 S.Ct. 1300 (a product feature that is functional "cannot serve as a trademark"); *Eppendorf–Netheler–Hinz GMBH v. Ritter GMBH,* 289 F.3d 351, 355 (5th Cir.) ("If a product feature is functional, it cannot be protected trade dress."), *cert. denied,* 537 U.S. 1071, 123 S.Ct. 671, 154 L.Ed.2d 565 (2002). The Lanham Act requires that to obtain protection for a particular trademark, the burden is on the plaintiff to prove that the trademark is not functional. Plaintiffs admit that they bear the burden of demonstrating that their trademark is not functional.

█ In *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.1975), the defendant manufactured and sold embroidered cloth emblems embodying the plaintiff hockey teams' registered trademarks and service marks. Defendant argued that plaintiffs' trademarks were functional. The Fifth Circuit rejected this argument:

[D]efendant asserts ... that plaintiffs' marks when embroidered on emblems for wearing apparel are functional and, thus, serve no trademark purpose ....

The short answer to defendant's arguments is that the emblems sold because they bore the identifiable trademarks of plaintiffs.... In the case at bar, the embroidered symbols are sold not be-

---

**5.** *See* defendants' opposition memorandum to plaintiffs' motion at p. 4.

**6.** Defendants filed a motion in limine to exclude plaintiffs' survey evidence, which was the product of a mall intercept study performed by one of the plaintiffs' experts. *See*

Record Document Nos. 61 (defendants' motion in limine) and 91 (plaintiffs' opposition). The issue need not be addressed because the court has reached a conclusion of likelihood of confusion without consideration of the survey evidence.

cause of any ... aesthetic characteristics but because they are the trademarks of the hockey teams. Those cases which involved utilitarian articles such as pole lamps, fluorescent lighting fixtures, and toggle clamps all involved products which had a consumer demand regardless of their source of origin. The principles involved in those cases are not applicable to a trademark symbol case where the design or symbol has no demonstrated value other than its significance as the trademark of a hockey team.

*Boston Professional Hockey Ass'n,* 510 F.2d at 1013 (citations omitted). As defendants admit, consumers purchase shirts of the universities' color schemes, logos, and designs in order to show support for the particular university; there is no consumer demand without these identifying characteristics. They have no demonstrated value other than their significance to identify with the universities. Accordingly, the court concludes that plaintiffs have demonstrated that their school color schemes, logos, and designs are not functional.

### 4. Fair use.

■■ Smack argues that even if the universities' color schemes, logos, and designs are entitled to trademark protection, its use thereof is a nominative fair use. The Fifth Circuit examined the nominative fair use defense in *Pebble Beach:*

> Courts have long recognized that one who has lawfully copied another's product can tell the public what he has copied. Likewise, one can use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product. This right to use a mark to identify the markholder's products—a nominative use—however, is limited in

that the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval.

> As the Ninth Circuit has recognized,[7] where a nominative use of a mark occurs without any implication of affiliation, sponsorship, or endorsement—i.e., a likelihood of confusion—the use "lies outside the strictures of trademark law." In order to avail itself of the shield of nominative use, the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder. By definition, the defendant cannot use the mark to identify its goods because this would not be a nominative use, and it would also suggest affiliation, sponsorship, or endorsement.

*Pebble Beach,* 155 F.3d at 545–46; *see also* 3 *McCarthy on Trademarks,* § 23:11, at 23–54–55 (stating that a "nominative fair use" occurs when a junior trademark user employs "another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services. This is not an infringement so long as there is no likelihood of confusion."). The court concludes that the nominative fair use defense is not applicable because plaintiffs have demonstrated a likelihood of confusion.

### 5. Laches.

■ Defendant argues that plaintiffs' claims are barred by laches. "Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." Laches is composed of three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Westchester Media*

---

7. The nominative fair use concept was developed by the Ninth Circuit in *New Kids on the*

*Block v. News Amer. Publ'g, Inc.,* 971 F.2d 302 (9th Cir.1992).

*v. PRL USA Holdings, Inc.,* 214 F.3d 658, 668 (5th Cir.2000) (citation omitted). Because defendants admit that they intentionally copied plaintiffs' color schemes, their bad faith deprives it of the ability to assert the equitable defense of laches. *See Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir.1985). Additionally, defendants have not demonstrated any undue prejudice to them from plaintiffs' alleged delay in asserting their trademark rights.

### B. OU's claim for infringement of the "OU" mark.

 Plaintiff OU owns several federal trademarks for certain stylized representations of its initials. OU argues that defendants' use of the letters "OU" on shirts referring to it or its accomplishments violates the Lanham Act. Because defendants' use of the OU initials does not match those in OU's registered marks, OU admits that its claim is for infringement of an unlicensed mark.

The court concludes that OU is entitled to summary judgment on this claim. The OU mark is extremely strong. OU has been known by its initials for many years, and defendants chose to highlight these two letters on their shirts for the precise reason that consumers would realize the letters refer to the university. Each of the digits of confusion set forth above apply with equal force to defendants' use of the OU letters on their shirts.

### C. The Louisiana Unfair Trade Practices Act (LUTPA).

 The requirements of the LUTPA "mirror those of the Lanham Act." *Prudhomme v. Procter & Gamble Co.,* 800 F.Supp. 390, 395 (E.D.La.1992); *see also Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033 (5th Cir.1984) ("Likelihood of confusion is the essential ingredi-

ent for claims of unfair competition under both the Lanham Act and the Louisiana [unfair trade practices] statute"). For the reasons stated, the court concludes that plaintiff LSU is entitled to summary judgment on its claim under the LUTPA.[8]

### D. Claims of Collegiate Licensing Company (CLC).

Defendants argue that the CLC lacks standing to sue because it does not own any of the trademarks at issue.

 The record reflects that CLC is the "exclusive agent" that has been designated by the plaintiffs to appoint licensees of their merchandise, and receives a royalty for the licensing fees that are generated. The only exceptions to CLC's exclusive agency designations are for certain non-retail sales such as "university purchases for internal consumption" or "student organization use."

Section 1125(a)(1) of the Lanham Act specifically provides that a cause of action may be asserted by "any person who believes that he or she is or is likely to be damaged" by infringing conduct, and the Fifth Circuit has held on several occasions that this provision permits the assertion of unfair competition claims by exclusive trademark licensees. *See Martin's Herend Imports v. Diamond & Gem Trading USA,* 112 F.3d 1296, 1301 n. 10 (5th Cir. 1997) (holding that exclusive importer had standing to sue for unfair competition under § 1125(a)); *Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137, 142 (5th Cir. 1972) (holding that exclusive sales agent "was a person damaged by the unlawful competition of [defendant], and therefore was entitled to maintain a civil action for injunctive relief under § 1125(a)"). Although the minimal exceptions to the CLC's licenses render it a non-exclusive

8. LSU is the only plaintiff that may assert a claim under LUTPA.

distributor, the court finds that these exceptions are not material, and do not deprive CLC of the ability to assert a claim under § 1125(a)(1). Similarly, CLC's agency agreements giving it the ability to distribute products bearing plaintiffs' marks gives it standing to assert its federal and state claims for infringement and trademark dilution. *See, e.g., World Championship Wrestling v. Titan Sports, Inc.,* 46 F.Supp.2d 118, 122 (D.Conn.1999). Accordingly, defendants' motion for summary judgment on CLC's claims is denied, and for the reasons stated above with regard to the specific university licensors, CLC's motion for summary judgment is granted.

## III. CONCLUSION

Plaintiffs' motions for summary judgment are granted, and defendants' motions for summary judgment are denied.